# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ricky George Jansen,

           **Civil File No.: 12-696 (RHK/SER)**

    Plaintiff,

v.

           **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security,

    Defendant.

---

  Edward C. Olson, Esq., 331 Second Avenue South, Suite 420, Minneapolis, Minnesota 55401, on behalf of Plaintiff.

  Ana H. Voss, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota, 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

  Pursuant to 42 U.S.C. § 405(g), Plaintiff Ricky George Jansen ("Jansen") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of his application for social security disability insurance ("SSDI"). This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. The Parties filed cross-motions for summary judgment [Doc. Nos. 14 and 16]. For the reasons set forth below, the Court recommends Jansen's motion for summary judgment be denied, and the Commissioner's motion be granted.

# I. BACKGROUND

## A. Procedural History

Jansen protectively filed[1] an application for SSDI on July 14, 2008, alleging his disability began on Sept. 1, 2004. (Admin. R. at 10, 33–34). At the hearing, through his representative, he amended his alleged onset date ("AOD") to March 12, 2009. (*Id.* at 34). Jansen alleges the following impairments: (1) degenerative disc disease,[2] (2) arthritic pain in multiple joints, (3) depression, and (4) memory loss. (*Id.* at 98). Jansen contends that these impairments "significantly limit his ability to do basic work activities." (Pl.'s Mem. of Law in Supp. of Mot. for Summ. J., "Pl.'s Mem.") [Doc. No. 15 at 11].

The Social Security Administration (SSA) denied Jansen's claim on September 30, 2008, and it was again denied upon reconsideration four months later. (*Id.* at 93, 101). Administrative Law Judge Roger W. Thomas ("the ALJ") heard the matter on August 17, 2010 and issued an unfavorable decision on October 15, 2010. (*Id.* at 10–20). Jansen appealed the decision, and the Appeals Council's denial of Jansen's request for a review of the ALJ's decision review rendered the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-4); 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). The SSA denies that Jansen has an

---

[1] Protective filing is a written or oral statement that clearly establishes intent to file for Social Security Benefits. The effect of a protective filing is to preserve the date of application. For example, if a hypothetical claimant sends a letter postmarked to SSA on February 1 explaining she intends to file next month, February 1 becomes her filing date, even if she actually sends her application on March 27. Program Operations Manual Sys. (POMS), GN 00204.010C.5a-e (SSA, June 23, 2011). There is no special format for a protective filing, as long as it clearly expresses intent to file, although oral statements of intent to file for SSDI benefits must be documented and signed by an SSA employee. POMS, GN 00204.010B.1 – GN 00204.010B.4 (SSA, June 23, 2011).

[2] Degenerative disc disease is the "gradual aging-related wear and tear" of the discs in the spinal column, making them less flexible and "more prone to tearing or rupturing with even a minor strain or twist." Mayo Clinic Staff, *Herniated Disc*, Mayo Clinic (Dec. 18, 2010) http://www.mayoclinic.com/health/herniated-disk/DS00893/DSECTION=causes.

impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. R. at 13). Jansen now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

This case turns on Jansen's eligibility for SSDI benefits, because he applied for coverage only under that benefits program. (Admin. R. at 10). There are two main forms of Social Security disability benefits: SSDI and Supplemental Security Income (SSI). The purpose of the SSI program is to "assure a minimum level of income who are age 65 of over, or who are blind or disabled and do not have the sufficient income and resources to maintain a standard or living at the established Federal minimum income level." 20 C.F.R. § 416.110. In contrast, individuals earn SSDI by engaging in employment. *See* Program Operations Manual Sys. (POMS), RS 00391.120. (SSA, July 26, 2012); POMS, DI 0115.001.A (SSA, Oct. 11, 2012). Payment of these taxes is a payment of an insurance premium. Once the payment stops, coverage eventually ends. POMS, RS 00301.148 (SSA Jan. 13, 2006). The SSA uses the term "date last insured" ("DLI") to describe the end of a claimant's coverage. *Id.* Jansen's DLI is December 31, 2009. (Admin. R. at 10). Accordingly, he must establish that he became disabled before that date in order to qualify for SSDI benefits. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

### B. Plaintiff's Testimony

As of the date of the hearing, Jansen was unemployed and lived with his wife and two school-age children. (Admin. R. at 35). Jansen was 5'9" tall and weighed 200 pounds. (*Id.*). Jansen's wife worked out of the home, and the family did not receive any financial assistance from the state or county. (*Id.* at 36). Jansen had not worked since 2004. (*Id.*). Jansen stated that he has a GED, and two years of technical school training in construction and maintenance. (*Id.*

at 38).  In the past he had problems with alcohol use, but did not use drugs.  (*Id.*).  He testified he quit drinking in September 2007.  (*Id.*).

Asked to describe his mental and emotional problems, Jansen testified that he had significant problems with concentration.  (*Id.* at 37).  For example, he testified that he often could not pay attention while driving.  (*Id.*).

In terms of his physical health, Jansen testified that he has problems walking.  (*Id.* at 39).  His ankles were hurt in an automobile accident in 1975, and he is "missing bones in [his] left foot."  (*Id.*).  Also, the tendons in his right knee were severed.  (*Id.*).  He has used knee braces and back braces, as well as crutches, as a result of that injury.  (*Id.*).  Jansen had right rotator cuff surgery, which made the pain in that shoulder go away.  (*Id.*).  His left shoulder, however, "doesn't reach around the way it should" and he testified he did not know what to do about it.  (*Id.* at 40).  Jansen also had surgery on his right elbow, which alleviated his pain but left him with limited ability to straighten his right arm.  (*Id.* at 39).

The ALJ asked Jansen several questions about his daily activities.  Jansen testified that his wife helps him put his shirts and socks on; he can bathe and feed himself.  (*Id.* at 40).  The ALJ next asked about a remark in Jansen's medical records that referred to him "doing some part-time work as a carpenter."[3]  (*Id.* at 40–41).  Jansen explained that he did not work as a carpenter, but he did do some woodworking as a hobby.  (*Id.* at 41).

The ALJ concluded his questioning by asking Jansen about his physical therapy regimen.  Noting that one medical record indicated Jansen was noncompliant with his physical therapy

---

[3]     The ALJ did not cite his source for this comment.  Presumably, he was referring to a note from the University Medical Center-Mesabi Hibbing Emergency Department, dated June 12, 2008.  (Admin. R. at 459).  The physician described Jansen's social history as "Married.  Smoker.  Unemployed.  Does some part-time work as a carpenter."  (*Id.*).

exercises, the ALJ asked Jansen about his current physical therapy.[4] (*Id.* at 42–43). Jansen said he was in physical therapy and rehabilitation. (*Id.*). He said his treatments included ultrasounds and stretching. (*Id.* at 43–44).

Jansen's representative began his questioning by asking Jansen to describe the pain in his back. Jansen stated that the pain "travels down into my lower legs on both sides. Doesn't seem to be both sides at one time. It goes down—unbelievable pain in my calf and the shin . . . ." (*Id.* at 45). His back pain has kept him awake at nights, including a two-week period when he "could not sleep at all because the pain—there was no position I could get in because the pain was in my left leg." (*Id.*). To manage his pain, Jansen testified that he takes Lortab[5] on an as-needed basis. (*Id.* at 46).

Jansen's representative asked several questions about Jansen's problem with concentration. Jansen said that he sometimes drives places and cannot recall how he got there, or watches television and is unable to concentrate on the show. (*Id.* at 47, 48). Jansen feels his concentration problem is worsening. (*Id.* at 48).

Finally, Jansen's representative questioned him about his relationships with other people. Jansen stated that he sometimes goes to parent-teacher conferences, but does not go out to dinner with his wife. (*Id.* at 49–50). He rarely sees friends, goes to restaurants, or movies; he believes his wife wishes "she had a different lifestyle." (*Id.* at 50). On some days when he not leave the

---

[4]     The source of this comment is also unknown. The transcript of the hearing is unclear as to whether Jansen's alleged non-compliance occurred in 2001 or 2010. (Admin. R. at 42). The Court presumes the ALJ refers to a record dated July 1, 2010 from St. Luke's Physical Medicine and Rehab indicating that Jansen was not currently in physical therapy and does not exercise at home. (*Id.* at 756).

[5]     Lortab is a combination of acetaminophen and hydrocodone bitartrate. U.S. National Library of Medicine, National Institutes of Health, *Lortab (hydrocodone birtartrate and acetaminophen) Tablet* (Oct. 2006), http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=1fb 18a80-8ef0-4bce-bb0d-9a86851c5206.

house, and at times he does not play with his children. (*Id*. at 51). There are three to four days a week when he does not leave the house. (*Id*. at 52). Jansen stated that "if [he] can't do stuff physically . . . it makes [him] feel like less of a person or something, and then it starts affecting [him] mentally." (*Id*.).

### C. Relevant Medical Evidence

#### 1. Effect of Jansen's Previous Application on his Current Application

Jansen previously applied for SSDI in May 2005. (*Id*. at 329). On that application, he alleged an onset date of November 1, 2003. (*Id*. at 328). At that time, he alleged the following conditions: spinal injury; degenerative disc disease; right knee injury; left foot injury; problems with his hands; problems with his fingers; right shoulder pain; and mental depression. (*Id*. at 333). He received a hearing, and was denied benefits on February 8, 2008. (*Id*. at 66–81). At that earlier hearing the following impairments were considered: (1) degenerative disc disease of the lumbar spine; (2) mild degenerative arthritic changes; (3) residuals of a 1975 motor vehicle accident affecting right knee, left ankle, and left foot; (4) dysthymic disorder; (5) major depressive disorder versus alcohol-induced mood disorder with anxiety; (6) pain disorder associated with psychological factors; and (7) alcohol abuse and dependence. (*Id*. at 72).

This Report and Recommendation does considered the medical evidence from that previous application for two reasons. First, Jansen did not request a reopening of that prior claim. *See Robbins v. Sec'y of Health & Human Servs.*, 895 F.2d. 1223 (8th Cir. 1990); *Hillier v. Social Sec. Admin.*, 486 F.3d 359 (8th Cir. 2007). Second, Jansen himself alleged a new AOD of March 12, 2009, an implicit acknowledgment of the correctness of the February 2008 decision. Accordingly, this Report and Recommendation describes Jansen's medical history

6

from the date of the previous ALJ decision to his amended AOD of March 12, 2009, and his medical history from the period between his AOD and DLI.

### 2. Records Between February 8, 2008 and Jansen's AOD

The relevant medical records begin with a Mental RFC Assessment on September 23, 2008 completed by Dr. Paul L. Berry, Ph.D., L.P., ("Dr. Berry"). Dr. Berry evaluated Jansen for the following conditions: Affective Disorders (Listing 12.04); Personality Disorders (Listing 12.08); and Substance Addiction Disorders (Listing 12.09). (Admin. R. at 477–494). Dr. Berry determined that Jansen "retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive instructions, but would be markedly impaired for detailed or complex/technical instructions." (*Id.* at 479). In addition, the assessment revealed that Jansen could carry out routine, repetitive tasks, handle brief and superficial contact with co-workers, and handle ordinary supervision and stress. (*Id.*). Dr. Berry evaluated Jansen as having a moderate degree of limitation in activities of daily living, social functioning, and maintaining concentration, persistence and pace. (*Id.* at 491). Dr. Berry further determined that Jansen had not suffered any episodes of decompensation. (*Id.*). Dr. Berry opined that Jansen's mental health conditions did not meet or equal any listings, and that a residual functional capacity (RFC) assessment was necessary. (*Id.* at 481).

There is also a two-page Physical RFC Assessment dated September 29, 2008, completed by Dr. Howard Atkin ("Dr. Atkin"). Dr. Atkin determined that Jansen has "[m]ild osteoarthritis[6]

---

[6]   Osteoarthritis is the erosion of cartilage, which becomes soft, frayed, and thinned. Pain and loss of functions result. Osteoarthrosis mainly affects weight-bearing joints, and is more common in older persons. *Stedman's Medical Dictionary*, Osteoarthritis (27th Ed. 2000).

of the right wrist, acromioclavicular[7] joint, and right elbow" but concluded his diagnosed conditions are non-severe. (*Id.* at 497).

Jansen visited Mesaba Clinic on February 2, 2009, complaining of low back pain, numbness in his hands and feet, and pain in his left foot. (*Id.* at 510). Dr. Philip W. Holmes, ("Dr. Holmes") who treated him that day, found that Jansen "appear[ed] his stated age and [did] not appear to be in any acute distress." (*Id.*). Dr. Holmes assessed Jansen's extremities, noting a "somewhat decreased active range of motion on abduction upper extremities at the shoulders," but "full active range of motion flexion/extension of the upper and lower extremities at the elbows and knees." (*Id.*). During that visit, Jansen requested a physical therapy referral and information about physical therapy exercises to do at home. (*Id.* at 511). Jansen returned to Dr. Holmes on Febraury 19, 2009, with a slight limp, and "complaining of continued pain in his left buttock region radiating down to his left foot." (*Id.* at 508).

On his February 2, 2009 consult with Dr. Holmes, Jansen "appear[ed] to have some major depression" and received a prescription for Cymbalta, an anti-depressant. (*Id.* at 511). At his follow-up visit on February 19, 2009, he was not sure if his Cymbalta was helping or not, but Dr. Holmes informed him that the drug can take more than a month to become fully effective. (*Id.* at 508).

Jansen participated in a physical therapy assessment with Craig Petroske, P.T., ("Petroske") in February 2009. (*Id.* at 531). Petroske's Preliminary Physical Therapy

---

[7] The acromioclavicular joint is the joint between the acromion (commonly called the shoulder blade) and the clavicle (commonly called the collarbone). The joint is sometimes referred to as the "point" of the shoulder. *Stedman's Medical Dictionary*, Acromioclavicular, Acromion, Clavicle (27th Ed. 2000).

Evaluation dated February 10, 2009 reports that Jansen has "significant crepitus"[8] in his acromioclavicular joint, but no tenderness. (*Id.*). In addition, Petroske described Jansen's range of motion as "grossly within functional limits and manual muscle testing is functional." (*Id.*)

Instead of regular physical therapy appointments, Jansen requested a home exercise program that would enable him to do exercises independently, so Petroske showed him some techniques to target the pain in his shoulder and lower back. (*Id.* at 532). His functional goals were to be "independent and compliant with [his] home exercise program" and "independent in the self-management of his symptoms" through his home exercise. (*Id.*).

### 3. Medical Records Between Jansen's AOD and DLI

Jansen's mental health care provider during the relevant period was Robert Stehlin, M.A. ("Stehlin"). Stehlin submitted a letter dated March 12, 2009 stating that Jansen arrives for his appointments "looking disheveled, unshaven, and sleepy," and has "poor social skills." (*Id.* at 519). Stehlin wrote that Jansen's physical pain affects his ability to pay attention. (*Id.*). Stehlin also reported that "Jansen's pain, lack of energy and depressed mood have seriously limited his ability to be active and take care of his family. His mood is seriously depressed." (*Id.*). Stehlin continued:

> [Jansen] has no friends and belongs to no groups. He has no social abilities at all. Almost suggesting Asberger's syndrome. Concentration on tasks is poor. Problem with ability to persist long enough to solve problems . . . When something goes wrong he loses interest and gives up. [Jansen] seems very limited. He does not work, has intractable pain and high levels of anxiety. He has no social life, no activities, and very little to look forward to.

(*Id.*).

---

[8]     Crepitus is noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions. *Stedman's Medical Dictionary*, Crepitus, Crepitation (27th Ed. 2000).

The Administrative Record contains a Psychological Evaluation by Dr. James W. Huber, Ph.D., L.P., ("Dr. Huber") dated March 26, 2009. (*Id*. at 524). Dr. Huber states that Disability Determination Services ("DDS") referred Jansen to him, and that he had seen Jansen previously for a clinical evaluation in 2005. (*Id.*). When questioned, Jansen reported his disability as "Stress and mental disability—I don't know if it's anxiety or concentration. I'm really nervous right now." (*Id.*). Jansen stated, "I'm just not basically living a daily life. I just don't like seeing or being around people—feel they're analyzing me, looking at me, seeing if I'm ok . . . ." (*Id.*).

Dr. Huber reported that Jansen leads a limited lifestyle, rarely leaving home and with no close friends. (*Id.* at 525–526). Dr. Huber observed that Jansen drove himself to their appointment, and appeared properly groomed and dressed. (*Id.* at 526). Jansen's thinking "appeared to be generally clear, relevant, coherent, and goal-directed although at times vague." (*Id.*). Dr. Huber found that Jansen could successfully, if slowly, recall words during a memory exercise and knew general information such as the names of the last two United States presidents. (*Id.* at 527). Dr. Huber evaluated Jansen's intellectual functioning as average. (*Id.*).

Dr. Huber listed his diagnostic impressions of Jansen as: generalized anxiety disorder; panic disorder with agoraphobia; major depressive disorder, recurrent, severe with psychotic features; social phobia; alcohol abuse in sustained full remission. (*Id*. at 527–28). Dr. Huber concluded his report as follows:

> [Jansen] appears to understand and follow instructions but would need reminders. His ability to consistently sustain attention and concentration, to carry out work-like tasks with reasonable persistence and pace, to respond appropriately to coworkers and supervisors, and to tolerate stress and pressure in the workplace are all markedly impaired.

(*Id.* at 528).

Jansen's primary care physician, Dr. R. Jon Rudberg ("Dr. Rudberg"), also saw Jansen on March 26, 2009. He stated Jansen's chief complaint was right arm pain. (*Id.* at 754). Dr. Rudberg referred Jansen to Dr. Daniel Vechell ("Dr. Vechell"), who completed a diagnostic imaging report on March 26, 2009. (*Id.* at 753). Dr. Vechell's findings were as follows:

> There are osteoarthritic changes of the elbow joint. There is a prominent olecranon spur[9]. There are positive anterior and posterior fat pad signs consistent with joint effusion[10] or hemarthrosis.[11] There are small osseus[12] densities posterior and anterior to the elbow joint suspicious for loose bodies.

(*Id.*).

Dr. Rudberg also referred Jansen to Dr. Leonard Jennings ("Dr. Jennings") for an orthopedic evaluation. (*Id.* at 754). Dr. Rudberg made the referral because Jansen was experiencing right arm pain and could not fully extend his right elbow, although Jansen has "no specific injury." (*Id.* at 535). In April 2009 Jansen visited Dr. Jennings. (*Id.* at 538). Dr. Jennings informed Jansen that he has suffered from arthritis for several years, and that the condition "does tend to progress." (*Id.*). Dr. Jennings suggested that if his condition deteriorates, "[Jansen] probably should have surgery done to clean out [his right elbow]." (*Id.*). According to Dr. Jennings's notes, Jansen replied that "[he] is not having that many symptoms and he would rather not have anything done," although Dr. Jennings did recommend some mild range of motion exercises, avoiding resting the elbow on hard surfaces, and Tylenol or Advil as

---

[9] The olecranon is the curved extremity of the ulna, sometimes referred to as the "elbow bone" or "tip of the elbow." *Stedman's Medical Dictionary*, Olecranon (27th Ed. 2000). An olecranon spur, or osteophyte, is a bony outgrowth or protuberance on the elbow bone. *Stedman's Medical Dictionary*, Osteophyte (27th Ed. 2000).

[10] Joint effusion is increased fluid around a joint. *Stedman's Medical Dictionary*, Effusion, Joint Effusion (27th Ed. 2000).

[11] Hemarthrosis means the presence of blood inside of a joint. *Stedman's Medical Dictionary*, Effusion, Hemarthrosis (27th Ed. 2000).

[12] Osseus means relating to bone, or bone-like in consistency and structure. *Stedman's Medical Dictionary*, Osseous, (27th Ed. 2000).

needed. (*Id.*). As a part of the visit, Dr. Jennings reviewed X-ray images of Jansen's elbow. His notes stated the images showed "significant arthritic changes and spurring."[13] (*Id.*).

In October 2009, Jansen saw Dr. William F. Schnell ("Dr. Schnell") to assess his right arm. (*Id.* at 746). Dr. Schnell reported that Jansen's chief complaint was "right elbow stiffness [with] intermittent severe pain and also locking and catching." (*Id.*). Dr. Schnell stated that Jansen "has been very hard on his body" but was "otherwise in satisfactory health" and described him as a "healthy, vigorous man who appears his stated age of 48." (*Id.*)

The following month, Jansen had a CT scan of his right elbow. The findings showed "extensive arthritic degenerative change within the elbow, with a loose body seen adjacent to the olecranon, measuring 1.2 centimeters in size." (*Id.* at 779). The CT scan also revealed some other, smaller loose bodies, but did not show evidence of fracture. (*Id.*).

### 4. Medical Records Dated After Jansen's DLI

Although this Report and Recommendation addresses only Jansen's condition from March 12, 2009 and his DLI of December 31, 2009, Jansen's Memorandum includes significant discussion of medical treatment after that date. (Pl.'s Mem. at 6-7). Most notably, he describes Dr. Elizabeth Weinman as his "treating physician" in his memorandum. (*Id.* at 13). Dr. Weinman supplied a medical opinion describing physical limitations much more severe than those of the DDS evaluators. (*Id.* at 738–42). For example, she stated that Jansen could lift no more than ten pounds, walk no more than two hours in a typical eight-hour day, and sit no more than three hours. (*Id.* at 738). The record reveals, however, that Dr. Weinman did not begin treating Jansen until July 1, 2010—approximately seven months after his DLI—and her medical opinion is dated July 21, 2010. (*Id*. at 745, 742).

---

[13] A spur, or calcar, is a dull projection from a bone. *Stedman's Medical Dictionary*, Spur, Calcar (27th Ed. 2000).

### 5.    State Medical Agency Consultants' Evaluations

The record contains two DDS evaluations from the relevant time period.  Janis L. Konke M.S., L.P., ("Konke") completed a Psychiatric Review Technique on April 8, 2009.  (*Id.* at 544).  She based her evaluation on Affective Disorders (Listing 12.04) and Anxiety-Related Disorders (Listing 12.06).  (*Id.*).  Konke determined that an RFC assessment was necessary.  (*Id.*).  Konke evaluated Jansen as having a moderate degree of limitation in activities of daily living, social functioning, and maintaining concentration, persistence and pace.  (*Id.* at 554).  Konke determined that Jansen had not suffered any episodes of decompensation.  (*Id.*).  The narrative portion of Konke's report states that Jansen complains "worsening anxiety yet [he does] not take any psychotropic medications [or participate] in psychotherapy . . . ."  (*Id.* at 556).

Konke's assessment included information about Jansen's previous mental health treatment.  For example, she described Dr. Huber's 2005 and 2009 Consultative Examinations.  (*Id.*).  Konke also described Stehlin's treatment, noting he failed to include a mental status description in his letter and offered only vague interpretations of psychological tests he peformed, such as the Minnesota Multiphasic Personality Inventory (MMPI).  (*Id.*).  Konke also noted that the file contains a number of evaluations on file, "but no indication of continuing treatment."  (*Id.*).

Konke concluded her findings by noting that Jansen "retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive instructions, but would be markedly impaired for detailed or complex/technical instructions."  (*Id.* at 560).  In addition, she found that in a work environment, Jansen could carry out routine, repetitive tasks, handle brief and superficial contact with co-workers, and handle ordinary supervision and stress.  (*Id.*).

Dr. Sandra Eames, a DDS physician, completed a Physical RFC Assessment on April 9, 2009.  (*Id.* at 566–73).  She gave Jansen a medium RFC on the basis of his allegations of pain, determining that he could occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit, stand or walk for a total of six hours in a normal workday.  (*Id.* at 568, 567).  In addition, she determined that Jansen could push or pull on an unlimited basis.  (*Id.*).  In the narrative portion of her assessment, Dr. Eames noted that Jansen received little medical treatment, and was only partially credible when he reported that he could not perform work-like tasks.  (*Id.* at 567–68).  Dr. Eames stated that the findings of Dr. Jennings's orthopedic assessment were "fairly benign" and did not support the degree of limitation he described.  (*Id.* at 568).

### D. The Vocational Expert's Testimony

Mary Harris ("Harris") testified as an impartial vocational expert ("VE") at the hearing before the ALJ.  (*Id.* at 53).  The ALJ posed a hypothetical to Harris about the working ability of an individual aged 48 to 49 years of age, with a GED, and Jansen's work history.  (*Id.* at 54).  For this portion of the hearing, the ALJ listed Jansen's physical diagnoses as degenerative disc disease; mild degenerative arthritic changes; and a history of knee débridement[14] and a motor vehicle accident that left him with ankle problems in both ankles and the left foot.  (*Id.*).  In addition, the ALJ noted that Jansen has psychological diagnoses including dysthymia or major depressive disorder and a history of alcohol-induced mood disorder.  (*Id.*)

The ALJ asked whether a person with the following characteristics could perform Jansen's past work: (1) capable of lifting up to ten pounds frequently and twenty pounds occasionally; (2) able to stand for four hours each in an eight-hour day and sit up to six; (3)

---

[14]     Debridement means the excision of devitalized tissue and foreign matter from a wound. *Stedman's Medical Dictionary*, Débridment (27th Ed. 2000).

occasionally stoop, crouch, crawl and/or kneel; (4) never work with hazards such as unprotected machines or climb ladders, ropes, or scaffolds; (5) be limited to routine, repetitive tasks/instructions; and (6) have only brief, infrequent, superficial contacts with coworkers; (6) work in an environment free from drugs and/or alcohol. (*Id.* at 55). Harris opined such a person could not perform Jansen's past work. (*Id.*).

She stated that the jobs available to a person with these characteristics and restrictions could work as a hand packager (DOT 559.687-074) or do small products assembly (DOT 729.687-030). (*Id.* at 56). At the time of the hearing, there were 16,000 such positions available in the Minnesota economy, but because the hypothetical limited standing to four hours out of each workday, Harris felt 5,000 available positions was a more realistic number. (*Id.*).

The ALJ then changed the hypothetical, noting that the VE's report had a functional capacity examination (FCE) that fell after the original AOD but before the amended AOD Jansen put forward at the hearing. (*Id.* at 56–57). The ALJ asked if the FCE's lifting limitations of up to thirty pounds occasionally, zero pounds frequently; occasionally climbing, stooping, crouching and/or kneeling; and frequently balancing would allow a hypothetical individual to do Jensen's past work. (*Id.* at 57). Harris said this would prevent the hypothetical individual from performing Jensen's past work, but the hand packaging and small products assembly jobs she described earlier would still be available. (*Id.*).

Jansen's representative next asked whether a hypothetical individual could work in hand packaging or small products assembly fields if he needed to walk around every fifteen minutes, for up to five minutes at a time. (*Id.*). The VE stated that those jobs would be incompatible with that restriction, and that she knew of no jobs that would be available to a person with such a limitation. (*Id.* at 57-58). Jansen's representative then asked if a hypothetical person could

function in a competitive work environment if his concentration was so poor that he needed repeated reminders to complete simple tasks. (*Id.* at 58). Harris replied in the negative. (*Id.*).

### E. The ALJ's Decision

On October 15, 2010, the ALJ issued an unfavorable decision. (*Id.* at 20). In finding that Jansen was not disabled, the ALJ employed the required five-step evaluation considering: (1) whether Jansen was engaged in substantial gainful activity; (2) whether Jansen had severe impairments; (3) whether Jansen's impairments met or equaled impairments listed in 20 C.F.R Part 404, Subpart P, Appendix 1; (4) whether Jansen was capable of returning to past work; and (5) whether Jansen could do any other work existing in significant numbers in the regional or national economy. *See* 20 C.F.R. § 404.1512(g), 404.1560(c).

At the first step of the evaluation, the ALJ found that Jansen had not engaged in substantial gainful activity since 2005. (Admin. R. at 12). At the second step, the ALJ found that Jansen had the following severe impairments: (1) degenerative disc disease of the lumbar[15] spine; (2) mild degenerative arthritis and bursitis;[16] (3) olecranon spur; (4) degenerative joint disease of the right elbow; (5) dysthymia[17] versus major depressive disorder (6) panic disorder with agoraphobia[18] versus generalized anxiety disorder; (7) chronic pain disorder. (*Id.*).

---

[15]     Lumbar refers to the part of the back between the ribs and pelvis. *Stedman's Medical Dictionary*, Lumbar (27th Ed. 2000).
[16]     Bursitis is the inflammation of a sac containing fluid found in parts of the body where a tendon passes over a bone, such as the hip or the elbow. *Stedman's Medical Dictionary*, Bursa, Bursitis (27th Ed. 2000).
[17]     Dysthymia is a chronic mood disorder manifested as depression for most of a day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. *Stedman's Medical Dictionary*, Dysthymia (27th Ed. 2000).
[18]     Agoraphobia is a mental disorder characterized by a fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are

At step three, the ALJ determined that Jansen did not have a physical impairment or combination of physical impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526. (*Id.* at 131). None of Jansen's impairments alone or in combination caused more than a minimal limitation on his ability to perform basic physical or mental work-related activities. (*Id.*). The ALJ discussed Jansen's physical ailments in detail, including his history of injuries and visits with medical providers. (*Id.* at 15). The ALJ also described Jansen's medical tests, including x-ray and CT scans. (*Id.* at 17).

In determining the extent of Jansen's mental impairments, the ALJ considered Affective Disorders (Listing 12.04), Anxiety-Related Disorders (Listing 12.06), and Somatoform Disorders (Listing 12.07). (*Id.* at 13). The ALJ found that Jansen had mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties with concentration, persistence, or pace. (*Id.*). Jansen had no episodes of decompensation and his medically determinable mental impairment was not severe because it caused no more than "moderate" limitations. (*Id.*).

At step four of the evaluation, the ALJ was required to consider Jansen's subjective complaints as well as objective medical evidence to determine Jansen's ability to perform past work. The ALJ specifically considered Jansen's testimony that he is unable to engage in competitive employment because of his back and neck pain, and the functional limitations affecting his limbs, as well as his depression, memory loss, panic, and social phobia. (*Id.* at 15). The ALJ also stated that he considered Jansen's subjective complaints of pain and evaluated the testimony within the provisions of *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984).

---

entered into reluctantly or are avoided. It is frequently associated with panic attacks. *Stedman's Medical Dictionary*, Agoraphobia (27th Ed. 2000).

The ALJ found that Jansen possessed the RFC to perform light work, defined in 20 C.F.R. Part 404.1567(b) as lifting and carrying twenty pounds occasionally and ten pounds frequently, standing or walking four hours out of an eight-hour day, and sitting six hours out of an eight-hour day, allowing for a sit/stand option every 30 minutes. (*Id.* at 14). Jansen's RFC limited him to occasional stooping, crouching, crawling, and kneeling, avoiding the climbing of ladders, ropes, and scaffolds, as well as work near heights, hazards or machinery. (*Id.*). Jansen is further limited to routine, repetitive instructions and tasks in unskilled work with brief, infrequent, and superficial contacts with coworkers and no public contacts. (*Id.*). In making these findings he acknowledged additional limitations on Jansen's ability to perform all or substantially all levels of this work. (*Id.* at 19). He relied on the VE's testimony that an individual of Jansen's RFC "would have been able to perform the requirements of representative occupations such as hand packer . . . and small products assembly." (*Id.*).

The ALJ then addressed Jansen's complaints of lower back pain, shoulder pain, and limb numbness in February 2009. (*Id.* at 15). In evaluating Jansen's impairments, the ALJ found that while his physical impairments could be expected to cause his alleged symptoms, Jansen's "allegations of disabling pain and incapacitation limitations are not consistent with or supported by the objective medical record of treating and examining physicians." (*Id.* at 15). The ALJ noted that Jansen's doctor recommended physical therapy, but Jansen "requested instruction in a home exercise program in place of formal therapy." (*Id.* at 15, 16). The ALJ also noted that Jansen's pain treatment and management was mainly limited to medication, including ibuprofen, Flexeril,[19] and Lortab. (*Id.* at 16)

---

[19]     Flexeril is the brand name for cyclobenzaprine HCl, which "relieves skeletal muscle spasm of local origin without interfering with muscle function." U.S. National Library of Medicine, National Institutes of Health, *Flexeril (cyclobenzaprine hydrochloride) Tablet, Film*

The ALJ emphasized that while Jansen "may have progressive issues with his back and neck" the claim before the SSA is for a very short period of time—March 12, 2009 to December 31, 2009. (*Id.* at 17). The ALJ highlighted the fact that Jansen required physical therapy during this period, but "was not interested in formal therapy," requesting a home exercise program instead. (*Id.* at 17). In addition, Jansen's

> overall functioning also suggested that he was able to manage good relationships with his family and get out into the community as needed and independently. [Jansen's] long work history suggests that he has been about to work competitively in the past and following his layoff in 2004 never returned to work.

(*Id.* at 18).

In reaching his conclusions, the ALJ considered "all medical opinions." (*Id.* at 17). He declined to assign controlling weight to Stehlin's assessment, because Jansen was "suboptimally treated for mental health at the time of this opinion and [Jansen] did not follow up with additional mental health care following the eight sessions of his evaluation period." (*Id.* at 18). The ALJ noted that Jansen did not mention his allegedly severe mental health limitations to his primary care physician, Dr. Rudberg. (*Id.*).

Despite his decision to reject some of Jansen's subjective allegations of pain and Stehlin's mental health assessment, the ALJ reduced Jansen's RFC to account for: (1) his need to change position frequently; (2) his lifting restrictions; (3) limitations associate with his knees, ankles, and shoulders, and the possible increased risk of imbalance "despite the absence of ongoing medical workup or treatment for remote conditions." (*Id.* at 18). The ALJ also reduced his RFC to account for mental health issues. (*Id.* at 18).

---

*Coated* (Jan. 2009), http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=f1e5977e-31d2-11df-b51e-3b5856d89593

At step five, the ALJ determined that Jansen was not capable of performing past relevant work. (*Id.* at 18). The transferability of Jansen's job skills was immaterial to the disability determination because Jansen was not disabled. (*Id.*); *see* SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2. The ALJ concluded that, considering Jansen's age, education, work experience, and RFC, Jansen was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, and that a finding of "not disabled" was appropriate pursuant to 20 C.F.R. Parts 404.1569 and 404.1569(a). (*Id.*).

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

### A.    Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. § 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. § 404.929. If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. 20 C.F.R. § 404.967–.982. If the request for review is denied, then

the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court. An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981.

### B.    Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive. 42 U.S.C. § 405(g). This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)). A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing an ALJ's decision, a Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.    DISCUSSION

Jansen does not dispute the ALJ's findings with respect to the first three steps of the sequential evaluation, but argues that ALJ's determination of his RFC was not based on

substantial evidence. (Pl.'s Mem. at 11). Jansen contends that no medical evidence supports the ALJ's RFC determination because the ALJ ignored an RFC assessment completed after Jansen's DLI and discounted the opinion of Stehlin, his mental health provider. (*Id.* at 13–14). Because he believes the ALJ's RFC determination was improper, Jansen asserts that the hypothetical questions posed to the VE were not based on substantial evidence. (*Id.* at 15). Jansen suggests that the ALJ should have relied on the medical opinion of Dr. Weinman, whom he describes as his treating physician, although their doctor-patient relationship did not begin until well after his DLI. (*Id.* at 11); (Admin. R. at 745).

### A. The RFC Determination is Supported by Substantial Evidence on the Record as a Whole

The determination of a claimant's RFC is a medical question. *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). An RFC determination must be supported with some medical evidence. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). It is the claimant, not the Commissioner, who bears the burden of proving an RFC. *Anderson v Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). Jansen disputes the ALJ's RFC findings, arguing that the ALJ did not rely on any medical evidence, and therefore cannot support a denial of Jansen's application for SSDI. (Admin. R. at 12); (Pl.'s Mem. at 12-13).

Jansen's arguments against the ALJ's RFC findings are misplaced. First, Jansen disputes Dr. Eames's assessment, arguing that she is a "psychiatrist not a medical doctor." (Pl.'s Mem. at 13). This statement is factually incorrect. A psychiatrist is a physician who specializes in psychiatry; the title requires a medical degree. *See Stedman's Medical Dictionary*, Psychiatrist (27th Ed. 2000).

Second, Jansen states that the ALJ does not provide the name of a particular medical provider upon whom he relied in determining the RFC. (Admin. R. at 14). Jansen states that "a

'reasonable mind' would be hard-pressed to look at the 'evidence' ALJ Thomas has relied on and accept it as adequate support for the conclusions the ALJ has drawn." (*Id.* at 14–15). It is true that an ALJ cannot rely solely on the opinions of non-treating physicians in determining a claimant's RFC because such opinions do not constitute substantial evidence. *Nevland*, 204 F.3d at 858. In this case, however, Jansen himself limited the time period under consideration when he amended his AOD at the hearing. His amended AOD gave the ALJ a very small universe of medical records outside of the DDS consultant's opinions to consider in formulating his decision.

Despite this, the ALJ assessed all the relevant medical evidence on the record. The ALJ's decision discussed Jansen's visits to Dr. Holmes, Mr. Stehlin, Dr. Huber, Dr. Rudberg, Dr. Jennings, and Dr. Schnell, in addition to the DDS evaluations. (Admin. R. at 16-18). Given the small set of doctors' notes and medical information available to the ALJ after Jansen amended his AOD, the ALJ's discussion is very detailed. In fact, the ALJ not only examined the medical records dating from that period, but also several medical records from the months immediately preceding Jansen's AOD. (*Id.*). The ALJ recognized the effect of Jansen's amended AOD on his case, writing that while Jansen may have "progressive issues with his back and neck," the period under consideration is extremely short, dating only between March 12, 2009 and December 31, 2009. (*Id.* at 17). The Court can find no indication that the ALJ affirmatively ignored or failed to consider the medical records from the approximately seven months under consideration when he made his RFC determination.

**B.     The ALJ Was Not Required to Consider Dr. Weinman's Opinion**

Jansen suggests that the ALJ should have considered Dr. Weinman's medical opinion, but discounted her without "any explanation as to his rationale." (Pl.'s Mem. at 13). Dr. Weinman first saw Jansen seven months after his DLI. (*Id.*). As noted above, the DLI is a bright

line; disabilities arising after that date are simply not eligible for SSDI. "New evidence is required to pertain to the time period for which benefits are sought and cannot concern subsequent deterioration of a previous condition." *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (*citing Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997)).

Even if Dr. Weinman's opinion were not rendered well after Jansen's DLI, there is still significant doubt that she would qualify as a treating physician on the date she wrote it. An ALJ must consider the following factors in evaluating a medical opinion: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of the evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist. 20 C.F.R. § 404.1527(d). The medical records in the administrative record establish that Jansen saw Dr. Weinman only once before she rendered her medical evaluation of his RFC. (Admin. R. at 745). Typically, a treating physician has an ongoing relationship with a patient. *See* 20 C.F.R. § 404.1502. "The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence generally does not constitute substantial evidence on the record as a whole." *Thompson v. Sullivan*, 957 F.2d 611 (8th Cir. 1992). In light of the SSA regulations and case law surrounding the definition of a treating physician and the weighing of a medical opinion, the Court does not find Jansen's arguments about Dr. Weinman to be compelling.

### C.    The Hypotheticals Questions Were Not Improper

Jansen argues that the ALJ failed to include the proper RFC in the hypothetical question posed to the VE, thereby rendering that testimony incapable of serving as substantial evidence supporting a denial of benefits. (Pl's Mem. at 20). "It has long been the rule in this circuit that a

hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record." *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996).

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Id.* at 296.

Jansen asserts that the VE's responses do not constitute substantial evidence because the ALJ improperly determined Jansen's RFC. (Pl.'s Mem. at 15). Citing *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994), he argues that the hypothetical question did not comprehensively describe the limitations on his ability to function. (*Id.* at 15). Jansen does not clearly state what is objectionable about the hypotheticals.

It is worth noting, however, that the ALJ's description of Jansen's medical problems was actually more extensive than Jansen's own claims. For example, Jansen alleged degenerative disc disease, arthritic pain in multiple joints, depression, and memory loss in his application. (Admin. R. at 98). The ALJ posed a much more comprehensive list of conditions to the VE, including degenerative disc disease, mild degenerative arthritic changes, and a history of knee débridement and a motor vehicle accident that left him with ankle problems in both ankles and the left foot. (*Id*. at 54). In addition to those physical ailments, the ALJ noted that Jansen has psychological diagnoses including dysthymia or major depressive disorder and a history of alcohol-induced mood disorder. (*Id.*). Thus, the VE considered a wide array of symptoms and ailments from Jansen's medical history. Jansen's argument that the VE did not have a comprehensive list of his limitations is unavailing.

**D.      The ALJ Properly Discounted the Opinion of Robert Stehlin**

Jansen contends that the ALJ improperly declined to give controlling weight to Stehlin, his treating mental health provider.  (Pl.'s Mem. at 13–14).  An ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements."  *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996).  In this case, the ALJ found that Stehlin's letter was unpersuasive. (Admin. R. at 18).  Although Stehlin treated Jansen eight times, his notes and records were not submitted as a part of the record.  Indeed, the only information from Stehlin about Jansen is a two-page letter and an MMPI scoring chart.  (*Id.* at 519–21).  The letter contains conclusory statements such as "[Jansen] has no social abilities at all."  (*Id.* at 519).

The ALJ explained his reasoning for discounting this evidence, noting that Jansen "did not mention similar severe limitations to his primary physician, Dr. Rudberg," and did not follow up with more mental health treatment beyond his eight sessions with Stehlin.  (*Id.* at 18).  Jansen alleges that he did mention his psychological symptoms to other doctors, but some of the records he cites in support of this contention date from 2004, and others do not contain any mention of mental health problems.  For example, Jansen cites pages 658 and 659 of the Administrative Record, which are both dated 2004.  (Pl.'s Mem. at 14).  In addition, he cites page 755, which contains no notes of psychiatric symptoms but merely a statement that "[Jansen's] past medical history, social history, and family history is noted."  (Admin. R. at 755).  While Jansen likely has a psychological condition of long duration, there simply is no evidence of disabling severity between March 12, 2009 and December 31, 2009.  The Court declines to recommend a remand "merely because the evidence is capable of supporting the opposite conclusion."  *Hensley*, 352 F.3d at 355.

## IV.     RECOMMENDATION

For the reasons discussed above, the Court recommends that the ALJ's decision to deny

Jansen's application for SSDI benefits should be upheld.  Based on all the files, records, and

proceedings herein, **IT IS HEREBY RECOMMENDED that**:

1.     Plaintiff Ricky George Jansen's Motion for Summary Judgment [Doc. No. 14] be **DENIED**  and

2.     Defendant Carolyn W. Colvin, Acting Commissioner of Social Security's Motion for Summary Judgment [Doc. No. 16] be **GRANTED.**


Dated: April 22, 2013

                                                        s/*Steven E. Rau* __
                                                        STEVEN E. RAU
                                                        United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by **MAY 6, 2013**, a writing which specifically
identifies those portions of this Report to which objections are made and the basis of those
objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting
party's right to seek review in the Court of Appeals.  A party may respond to the objecting
party's brief within ten days after service thereof.  A judge shall make a de novo determination
of those portions to which objection is made.  This Report and Recommendation does not
constitute an order or judgment of the District Court, and it is therefore not appealable to the
Court of Appeals.